IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 12, 2002 Session

## STATE OF TENNESSEE v. GEORGE T. WIEBE,  IN RE:  PAUL'S BONDING COMPANY, INC.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-C-2034     Steve R. Dozier, Judge**

**No. M2001-00350-CCA-R3-CD - Filed July 16, 2002**

Bonding company for absconded defendant appeals final forfeiture of bond and alleges that its agents were without authority to issue an alleged illegal bond.  Concluding that bonding company's employee had authority to act, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ALAN E. GLENN, JJ., joined.

Joel H. Moseley, Sr., Nashville, Tennessee, for the appellant, George T. Wiebe, In Re:  Paul's Bonding Co., Inc.

Paul G. Summers, Attorney General and Reporter; Christine M. Lapps, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and John C. Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On January 28, 1999, the trial court issued a conditional forfeiture against defendant George T. Wiebe and his surety, Paul's Bonding Company, in the amount of $500,000.00.  A *scire facias* was issued and served on the surety, and a *capias* was issued for the arrest of defendant.

The surety filed an answer to the *scire facias*.  A final forfeit hearing was held, and the trial court subsequently ordered that the forfeiture become final.  In doing so, the trial court lowered the bond amount to $250,000.00.

The surety subsequently requested the court to alter or amend its order. However, the trial court denied the request. The surety's notice of appeal timely followed.

## Facts

Defendant was arrested and charged with possession of marijuana. Bond was subsequently set and posted in the amount of $500,000.00, and a Davidson County grand jury returned an indictment for possession with intent to deliver seventy pounds of marijuana.

The surety presented to the court a death certificate, and the court ordered the matter abated by death. Subsequently, a police investigation revealed that two agents of the surety, Peggy Coleman and James Ferrell, along with Jose Herrera, a bondsman from Texas, entered into an agreement whereby they would receive and divide $250,000.00 for defendant's release. After receiving their money, they posted $50,000.00 on the surety's books to reflect the statutory premium.

Shortly thereafter, an undercover police sting operation involving another fake death certificate on another client led to the arrest of Coleman, Ferrell, and Herrera. All three were charged with money laundering and fabricating evidence. Coleman pled guilty to fabricating evidence, and Ferrell pled guilty to money laundering. Herrera entered a plea of *nolo contendere* to the charges of money laundering and conspiracy to commit money laundering and pled guilty to fabricating evidence. The record, as well as the trial court's findings, reflects that Coleman, Ferrell, and Herrera entered pleas to similar charges in other courts as well. They were subsequently sentenced in Davidson County Criminal Court. At that time, defendant was still at large and believed to be residing in Mexico.

Upon learning that the death certificate for defendant was not authentic, the trial court set aside the judgment and entered a *capias* for defendant and a conditional forfeiture of the appearance bond. The court also entered a *scire facias* against the surety, ordering it to appear and show why the forfeiture should not become final. The surety filed an answer and an amended answer alleging that the bond should be remitted because the surety exercised due diligence in establishing procedures by which the employees were to operate when undertaking bond obligations. The surety contended that the employees failed to follow the company protocols and entered into a criminal conspiracy defrauding the company and the criminal justice system.

Subsequent to a hearing conducted on the issue of whether the forfeiture should become final, the court determined that the forfeiture should be reduced from $500,000.00 to $250,000.00. The surety appeals the trial court's decision and asks that it be relieved from the entire amount of the debt.

### Hearing on Final Forfeiture of Bond

Charles Wheeler testified that he was the owner of Wheeler Bonding Company, Inc. and was employed by the surety's law firm to assist in the location and apprehension of the forfeiting

defendant. Wheeler stated that he located defendant and that defendant was residing in LaJunta, Mexico. Wheeler stated, however, that he did not try to apprehend defendant because the United States does not have an extradition treaty with Mexico. Wheeler stated that he had never seen defendant nor talked with defendant. When asked if he knew whether or not anyone had seen defendant after the surety had given the death certificate to the trial court on September 30, Wheeler responded that as of July 30, he was notified that defendant was living in Mexico. He stated that he had gained that information from defendant's uncle, who owned a trucking business together with defendant in Canada.

Wheeler testified that he spoke with no other witnesses who stated that defendant was living in Mexico. He also stated that he did not have any documentation proving that defendant was in Mexico. Wheeler said he had information that defendant was working at a business in New Mexico; however, he did not physically locate defendant in New Mexico. A trip to El Paso, Texas, to visit defendant's family members also revealed that no one would tell Wheeler where defendant was located.

Michael Wayne Campbell testified that he was president of Paul's Bonding Company, the surety. His grandfather, Paul Sullivan, helped Campbell start and fund the business several years ago. He stated that during his grandfather's illness in 1990, Coleman ran the business. He stated that he only spoke with her four or five times during 1998, the year of execution on defendant's bond. The only documents he reviewed were total sum deposits furnished him by his accountant, Morris Hickman. The company had no procedures whereby Coleman was required to notify Campbell about a specific bond amount. Campbell said that he would not have known about his employees' illegal activities if there had been no police sting operation. He further stated that he would have questioned Ferrell about expenses incurred on defendant's bond if Campbell had actually reviewed the expense reports. Since the discovery of the employees' illegal actions, Campbell had implemented various safeguarding procedures to prevent any such future conduct.

Campbell testified that he did not see anything that indicated Coleman was not discharging her duties properly. Subsequently, Coleman became vice-president of the corporation. She was general manager and ran the day-to-day affairs of the business. Campbell said that he never received anything from his certified public accountant (CPA) indicating that he needed to conduct an audit on the business, investigate Coleman's activities, or be suspicious of anything Coleman had done.

He stated that in the fall of 1998 he heard rumors that Coleman was using fake death certificates. He subsequently met with her to discuss the rumors. Coleman was instructed to go meet with the surety's attorneys. Campbell said that he is not exactly sure what happened after that.

In 1999, the surety was asked to participate in a sting against Herrera in connection with a bond. The surety was given money by the local police department, and the surety wrote the checks out of its own checking account. The purpose of the sting was to get Herrera to obtain a phony death certificate on another client, Rais Castro. Campbell stated that only after the sting did he learn about the bond on defendant in the instant case.

Campbell said that prior to the hearing, the surety had no unpaid final forfeitures. On cross-examination, Campbell testified that the checks from the corporation's checking account had to be signed by two people and that the three eligible people were himself; his mother, Wanda Campbell; and Coleman. He stated that Coleman was never authorized to spend the corporation's money on her own signature alone.

Campbell later read in a newspaper that Coleman had been accused of participating in criminal activities with Ferrell. He also read in the newspaper that, as a result of those activities, the surety's bonding company had been enjoined from signing any more bonds. These events had come about because of Coleman's dealings with fake death certificates.

Campbell stated that, at one point, Coleman came to him and stated they needed to increase their bonding capacity. He stated that he always granted her requests to raise the company's bonding capacity. He further stated that he did not know of any instance where his father, James Campbell, denied her request to raise the bonding capacity. However, Coleman had the ability to increase the bonding capacity without Campbell knowing about it because she had access to other company funds she could use to increase the bonding capacity. Coleman would accomplish this without Campbell's signature on the checks because over the years, Campbell began to trust Coleman more and would allow her to sign both signatures on the checks. Campbell stated that the company did not have an insurance policy to protect itself against mismanagement or fraud of any employees.

Campbell testified that before the police sting, the company was being operated by Coleman. He stated that he had knowledge that any expenses incurred in writing a bond would be deducted from the company's portion and reimbursed to the employee before a deposit was made. Even though he did not expressly give his permission to do that, he knew what was going on and knew that was the way Coleman operated the business.

The deposition testimony of Campbell's father, James Campbell, son-in-law to Paul Sullivan and 49% shareholder in the company, revealed that Coleman was running the business after Sullivan's death. He stated that he never knew that the surety's bonding capacity was exceeded or that there was even a bond on defendant. He said that the company's board usually met annually, but he did not realize that Coleman was on the board. He said that he did not spend much time at the business at all and that Coleman did not consult with him concerning forfeitures or other agents of the company. Finally, he stated that he only knew Ferrell by sight and would not feel comfortable talking to him about the business.

Morris Hickman testified that he was the CPA for the surety. He stated that he dealt with Peggy Coleman and that she would generally give him the information upon which he could base financial reports for the surety. He also stated that he never saw anything in the information that suggested that an audit should be conducted.

## Analysis

Initially, we agree with the trial court's statement that "a bail bond is essentially a contract whereby a surety guarantees the appearance of a accused in court." Tenn. Code Ann. § 40-11-114, 122(2) (1997); see State v. Clements, 925 S.W.2d 224, 226-27 (Tenn. 1996). In this case, the State contends that the surety, through the acts of its agents, is bound by its contract to ensure defendant's appearance in court. The surety, however, contends that it is not bound because the execution of the bond was illegal and therefore, unenforceable. On appeal, the surety raises two issues: (1) the surety is not liable for the illegal acts of the rogue agents. More specifically, the trial court incorrectly applied the standards of Tennessee Code Annotated section 48-18-301; and (2) the forfeiture should be remitted pursuant to Tennessee Code Annotated section 40-11-204.

This Court recently addressed the issue of a trial court's role in bond forfeitures, as well as the substantive law governing forfeiture of bonds:

> The forfeiture of bail is governed by statute. Tenn. Code Ann. §§ 40-11-201 through -215. When the defendant fails to appear as required, the issuance of a scire facias requires sureties to give reasons why a forfeiture of bail should not become final. Tenn. Code Ann. § 40-11-202. Trial courts have the discretion to relieve bail bondsmen or other sureties from the liability of bail and are authorized to hold hearings to determine whether the forfeiture should be excused, lessened, or absolutely remitted. Tenn. Code Ann. § 40-11-204. The discretion has been described as broad and comprehensive, empowering trial courts to make determinations "in accordance with [its] conception of justice and right." Black v. State, 154 Tenn. 88, 92, 290 S.W. 20, 21 (1927).

State v. Shredeh, 909 S.W.2d 833, 835 (Tenn. Crim. App. 1995). Accordingly, in reviewing a trial court's determinations, we apply an abuse-of-discretion standard. State v. Robinson, 2000 Tenn. Crim. App. LEXIS 655, No. E1999-00950-CCA-R3-CD, 2000 WL 1211316, at *3 (Tenn. Crim. App. at Knoxville, Aug. 28, 2000). Under an abuse-of-discretion standard, this Court grants the trial court the benefit of its decision unless the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997); see also State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). For the reasons set out below, we conclude that the trial court did not abuse its discretion in ordering the final forfeiture of defendant's bond. Accordingly, we affirm the judgment.

*I. Surety's Bond Writing Capacity and Agent's Bond Writing Authority*

The surety first contends that it is not bound by the acts of the "rogue agents." The surety asserts that the acts of the employees should not be attributed to the surety because the surety in fact did not have the capacity to write the bond in the instant case. The surety asserts that the execution of the bond exceeded the surety's bond-writing capacity and was thus, an action that the surety itself could not have undertaken. Ergo, because the surety could not have the power to execute the bond, the agent could not have the authority to execute the bond. In arguing its claim, the surety attempts to shift the blame to the Davidson County Criminal Court Clerk's Office because the clerk's office allowed the surety's employees to exceed the surety's bonding capacity.

In rebuffing the surety's attempt to distribute the blame among the employees of the Davidson County Criminal Court Clerk's Office, we conclude that the trial court properly ruled that the surety is bound by the acts of its agents and is liable on the bond.

First, we affirm the trial court's finding that the surety had the authority and ability to execute the bond at issue. The proof shows that upon executing defendant's bond, the surety was over its bonding capacity by $158,000.00. As reflected in the trial court's opinion, the deposition of Elaine Ragan, Division Chief of the Davidson County Criminal Court Clerk's Office, indicated that although it was unusual for the surety to be over capacity by $100,000.00, it was not unusual for bonding companies to exceed their bonding capacity. Assistant District Attorney General John Zimmerman stated in his deposition that it was common for bonding companies to exceed their capacities. The surety's employee in charge of compiling reports regarding the bonding capacity, Sherry Donaghey, testified that executing bonds exceeding capacity occurred regularly. The record further shows that at no time was there a court order prohibiting the surety from executing any bonds due to overcapacity. Therefore, the surety never lost its authority to execute any bond. We conclude that, contrary to the surety's assertions, the execution of the bond was not *per se* illegal and that the surety had the authority to execute the bond.

Second, we affirm the trial court's finding that the actions of the agents were within the scope of employment and that such actions bind the principle, in this case, the surety.

We initially note that the scope and extent of an agent's authority are questions of fact that must be determined from all of the facts and circumstances of the particular case. Southland Express, Inc. v. Scrap Metal Buyers of Tampa, Inc., 895 S.W.2d 335, 340 (Tenn. Ct. App. 1994). Whether an employee is acting within the scope of employment becomes a question of law, however, when the facts are undisputed and cannot support conflicting conclusions. Tennessee Farmers Mut. Ins. Co. v. American Mut. Liab. Ins. Co., 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992). When determining if an agent's actions are within the scope of authority, we view the actions in light of the Restatement (Second) of Agency. Id. at 937. The Restatement states as follows:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>> (a) it is of the kind he is employed to perform;
>> (b) it occurs substantially within the authorized time and space limits; [and]
>> (c) it is actuated, at least in part, by a purpose to serve the master; [...]
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

RESTATEMENT (SECOND) of AGENCY § 228, p. 504 (1957). An agent's authority to bind its principal may be actual or apparent. Actual authority is the "power which a principal intentionally confers upon the agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess." 2A C.J.S. *Agency* § 147 (1972). It may be either expressed or implied. Id. Likewise, apparent authority is the "authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to stop the principal from denying its existence." Id. § 157.

The proof in this case reveals that the surety's company was run almost exclusively by its agent, Coleman, because owners James Campbell, Mike Campbell, and Wanda Campbell had almost no involvement in the business. Indeed, Coleman ran the day-to-day affairs of the business as she wrote bonds and supervised other agents. Mike Campbell testified that he allowed Coleman to sign his name on company checks and that Coleman had access to other company funds. Coleman officially served as vice president of the company and was general manager of the business. Her position allowed her to write and approve bonds for the company. We agree with the State that, in her capacity as general manager and vice president of the surety's bonding company, Coleman approved defendant's bond that was written by another agent, Ferrell. When applying the facts to the principles espoused in the Restatement, it is clear that entering into bonding agreements was the type of work Coleman was employed to perform; she entered into the bond while at work for the surety; and she executed the bond, at least in part, to serve the surety's business, this reflected in the fact that she and Ferrell entered $50,000.00 onto the company's books to reflect the statutory premium. She was certainly granted express authority to execute bonds, write checks, and generally run the daily affairs of the business. She also had apparent authority as she was held out as the company's general manager and vice president. The evidence is quite clear that Coleman acted within the scope of her employment when executing the bond.

Having already determined that the surety itself had the ability and authority to execute the bond, we conclude that the agents had such authority and therefore bound the surety to the bond amount.

Finally, the surety contends that the trial court applied an incomplete standard in evaluating the surety's conduct as director of the corporation. The trial court made the following statement in its final order:

> Under Tenn. Code Ann. § 48-18-301(a) (1995), "A director shall discharge all duties as a director . . . (1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner the director reasonably believes to be in the best interests of the corporation." While there is no indication that the directors of the surety were not acting in good faith, it is certainly apparent from their "absentee management" that they were not acting prudently or in the best interests of the corporation.
>
> . . . [T]he directors, pursuant to their duty under Tenn. Code Ann. § 48-18-301(a) (1995), should have reviewed the capacity reports made by Ms. Donaghey and prevented any bonds written over the capacity of the company.

Subsection (b) of the statute states that a director, in discharging its duties, is "entitled to rely on information, opinions, reports, or statements" prepared by another officer or employee the director reasonably believes is "reliable and competent in the matters presented." Tenn. Code Ann. § 48-18-301(b)(1). The surety asserts that in ignoring subsection (b), the trial court "applied a 'hindsight' standard and not a front-end duty standard" to the directors' conduct. Hence, the directors should be able to reasonably rely on their employees and thus be excused from liability. The State, however, responds by noting that the surety's reliance on its employees is not an issue critical to the current case. Rather, the issue is the enforceability of the bond. In its reply brief, the surety

contends that it does not seek exoneration based on the statute's application but, rather, that the trial court should have referenced the statute in its entirety and not simply subsection (a). The record reflects that the statute is only first mentioned in the trial court's opinion.

We agree with the State that the issue central to this case is the enforceability of the bond and not whether the surety could reasonably rely on its employees. Further, and contrary to the surety's assertion in its reply brief, it is apparent that the surety wishes to be exonerated from the bond amount by seeking application of subsection (b) of the statute. Though the surety did not rely on the statute in its answer or amended answer to the *scire facias*, the surety wishes to escape liability by having this Court apply subsection (b). We choose not to do so and conclude that liability is based on the agency principles discussed *supra*. Lastly, we conclude that the statute applies to causes of action by a corporation against an officer or other fiduciary. We agree with the State's assertion that the statute does not provide a remedy in such a case as this where the issue is a third party's ability to enforce a legally executed bond. We affirm the trial court's judgment.

*III. Remission of Bond Amount*

Finally, the surety contends that even if this Court concludes that the surety's employees were agents acting within the scope of authority when executing the bond and thus binding the surety, fairness dictates that the surety be exonerated. We disagree and affirm the trial court's judgment.

In making its argument, the surety relies on this Court's opinion in State v. Shredeh, 909 S.W.2d 833 (Tenn. Crim. App. 1995). In Shredeh, we determined that the trial court's remission of the bond by 40% was proper. In doing so, we concluded that the trial court acted well within its discretion. Indeed, the trial court made specific factual findings upon which it based a thorough, thoughtful opinion. Shredeh, 909 S.W.2d at 836. Therefore, we found no abuse of discretion and noted that appellant failed to prove otherwise by a preponderance of the evidence. Id. This Court noted that the trial court's remission in the bond amount was, to some extent, due to the finding that the surety "had exercised some diligence . . . before undertaking the risks" involved in issuing the bond. By implication, the trial court also found that the surety had not exercised *enough* diligence to warrant total relief from the bond amount. Id.

The surety in the instant case contends that because such a remission was sanctioned by this Court on appeal in Shredeh, the surety is deserving of "complete exoneration." We disagree. First, we again note that our function in a case such as this is to evaluate whether or not the trial court abused its discretion. The trial court in this case observed witnesses and listened to extensive testimony on the issues. It found that there was "no conclusive proof" that defendant was in Mexico and, therefore, in a jurisdiction from which extradition was not possible. Further, the court found that the "impossible" situation in which the surety claimed to be was due to the surety's failure to recognize the various "red flags" alerting it. As indicated by the trial court, defendant's New Mexico address on the bond application certainly should have been the subject of a "reasonable inquiry" by the directors of the bonding company. Indeed, the surety's failure to implement certain policies and

procedures certainly contributed to the employees' ability to write such a large bond on this out-of-state defendant in the first place.

The record supports the trial court's judgment, and, in our view, the court rendered a well-reasoned opinion reflecting why the surety should be obligated to pay the forfeiture amount. Moreover, we note that the trial court in the instant case already reduced the amount of the bond from $500,000.00 to $250,000.00 in the interests of what is "just and right." We conclude that the trial court did not abuse its discretion in ordering the final forfeiture for this amount.

Finally, the surety alleges that because the extradition treaty between the United States and Mexico is practically unenforceable, it is impossible to surrender defendant, and the surety should therefore be exonerated. However, we agree with the State's position that a "lack of an enforceable extradition treaty between the United States and Mexico does not warrant relief" to the surety. This holding is certainly in line with our holdings in Shredeh and In re: Paul's Bonding Company, Inc., 62 S.W.3d 187, 194-95 (Tenn. Crim. App. 2001) app. denied (Tenn. Sept. 17, 2001) perm. to appeal denied (Tenn. Sept. 17, 2001). We therefore affirm the forfeiture of the bond.

## CONCLUSION

Accordingly, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE